And we will take up Zindel v. Fox Searchlight Pictures. Good morning. May it please the Court. Good morning. I'm Alex Kaczynski and I represent David Zindel, who is the son and literary heir to Paul Zindel, the Pulitzer Prize winning playwright and author of Let Me Hear You Whisper. Dismissal of a complaint for lack of substantial similarity before any discovery is virtually unheard of. Indeed, this Court has never affirmed the dismissal of a case alleging infringement of a literary work without discovery and a published opinion. That's not me speaking. This is from a concurrence in a decision by this Court last year reversing the very same district judge who dismissed the case here. The Astor White concurrence has a great deal of wisdom to it. I commend it to the Court's attention. It is not published, but I suggest that it has great persuasive value. It suggests why it is not only unwise, but even a denial of due process to deny a plaintiff the opportunity to present evidence. I have a question about the discovery. So this is a case in which the judge had both works in front of him as part of the motion to dismiss. Well, not quite, Your Honor. Largely. He had the movie. Had the movie. Had the script. Fair enough. Okay. And this is what Astor White talks about. It dealt with a treatment and explains why looking at the treatment is not the same as looking at the finished work. Here's my question, though. My question has to do with discovery. In the brief, both in the opening brief and the reply brief, there's a discussion about the possibility of expert testimony. I'm trying to figure out in this situation what the expert testimony might involve. Thank you for the question. I was hoping it would be asked because it is very important and it's key to this case. What we are doing here is comparing a full-fledged motion picture, you can see it on the screen, you can hear the dialogue, to a script. And it's a script of a play, something that is presented on a stage. This court 70 years ago pointed out, it's another case involving Fox Films, it's called Fox Films vs. Stone Cipher, that there are differences between films and plays. And it's particularly difficult when the play isn't played out. It's a script. Let me just give one example because it's important to be concrete here. This court and my colleagues dismiss the song that plays. So we have this cold laboratory where animals are being tortured and there is this song that's being played. And they say, well, that was just something that was put there to teach the creature how to speak. But an expert would point out is that when you don't hear it on the page, when you see it on the stage, you hear the music. What is a cold laboratory, a place where animals are killed and tortured, and the dolphin here is tortured, in fact winds up having a romantic dimension to it. So an expert would be able to sort of translate what's on the paper to what happens on the stage. Exactly, and explain what effect this would have on the audience and explain why things on a stage are naturally going to be different from things on a screen. And the question is whether or not what they've done here is taking the essence, the heart of Paul Zendel's play. Now, we're not claiming, and David Zendel and, you know, the painters are not claiming that we're entitled to the story. That we're entitled to the story. You know, the story's been told many times. It's been told many times before the play. It's been told many times before the movie of a human being making friends with a otherworldly creature. Some non-human entity, and helping that entity escape a dreadful fate. But what is protected is the way in which Paul Zendel chose to make that, tell that story. The artistic and literary choices that he made. He made the choice to put it in a laboratory, a facility where animals are tortured. That's not necessary to the story. He chose to add the romantic element. Why teach the dolphin to speak by playing a love song? I mean, if you were just trying to get him to speak, you could use this Pledge of Allegiance, or Mary Had a Little Lamb. You know, anything at all. It was a literary choice. Now, my colleagues dismiss it. They say, well, this was just put there by the experimenters, by the operators of the facility to teach the dolphin how to speak. But it wasn't put there by the operators of the facility. They are just characters. The gramophone is put there by Paul Zendel. And if you look at the script, and it doesn't come out when you just read it, is it keeps coming up at key times. And if you are watching it on stage, you would realize the effect of it. Assume the only similarities we find are that both the screenplay and the movie have a female janitor who tries to free an animal via hamper. Is that enough for substantial similarity? Excuse me? Is that enough for substantial similarity under the law, if those are the only similarities we find? A female janitor who tries to free... But there are many more. I don't agree. Assume I don't agree with you on the other ones, on whether the screenplay was a romance or not. But assume the similarities are that it's a female janitor, the protagonist is a female janitor, who tries to free an animal via hamper. Is that similarity sufficient to be a substantial similarity under the law? It would depend somewhat on expert evidence. The expert would point out that this isn't the fact that she's a janitor that's important. What matters is it's the lowest person in the facility. There are all these doctors and PhDs and scientists involved, and she's the lowest of the low. And who does the creature choose to make a connection with? With her. It refuses to speak to the doctors. It refuses to speak to the scientists. And why? Because it has a conscience. Isn't that a typical Hollywood cliché? You know, the animal that finds common ground with the lowest, you know, someone who isn't respected by others or who may be mistreated by others? Isn't that a typical Hollywood trope? You know, as this quote said in Birchick, in Hollywood, as in life, there's nothing new under the sun. And by that standard, everything you find in the movie, everything you find in every movie, will have been a star character for something else. None of us build from scratch. We all stand on the shoulders of others. And the fact is, the choices, and this is why the district court's dismissal of the, just brushing aside of the selection arrangement test is entirely incorrect. It is just purely, clearly error. The district court said there are no differences at all, there are no similarities at all, protected or not. Well, clearly there are. There's the pamper. There is the killing of the creature. There is the relationship between them, whether you call it romantic or something else. But what you say is right, though. It's pretty clear, then, that the case couldn't even go out on summary judgment. Have to go to trial. Well, I would hope this court will hold that. I mean, but the point is... Right back here. I guess the point is, though, I mean, you make a big point about the motion to dismiss. But again, the works are largely there, so there's this addition of expert testimony. If you're going to get that, that means if you can't do enough of, if a judge can't do a comparison on the paper that he or she has, then, because there has to be expert testimony, then it's kind of a nice way of saying all these cases are going to have to go to trial. Well, not necessarily, although we think this case should go to trial. Because on summary judgment, we can bring in evidence of experts. And we can at least hope that the district court will consider. In this case, the district judge made the decision, much as in Astor White, as you will read the concurrence, without even an argument by the lawyers. So the judge doesn't simply decide the facts. And this is a fact question. Substantial similarity is a fact question on this court's law. And the judge decides the case, doesn't hear from experts, doesn't want to hear from jurors, doesn't even want to hear from the lawyers. Just simply makes a decision in chambers about something that's as sensitive and delicate as literary equivalence. What rule? I mean, we don't, so it's only recently that we have this situation with district court judges sitting in their chambers with no expertise or knowledge of the film industry whatsoever, not even having the benefit of argument from counsel and deciding things on a 12B6 motion when the standard is plausibility. Should we develop a rule that that simply should not occur? We should prohibit dismissals based on substantial similarity under those circumstances? I mean, there has to be. I mean, I look at this case, and I look at Astor White, and there must be some cases that are just so frivolous that they deserve to be dismissed at the 12B6 stage for failure to plausibly state a claim. But then there's others where it begins to get grayer. And I'm just seeing district courts just disposing of cases on the easiest ground available. And I think it's troubling me, but I don't know what rule is the right rule to have. I mean, Nimmer says, and I've always agreed, that even grants of summary judgment should be extremely rare in this kind of a case. So grants of summary judgment are a much higher standard that you have to meet than just plausibly stating a claim. That aspect of this case, counsel, really troubles me. I do not want to encourage district court judges to do this. But I don't know what role to make.  30 years ago, 40 years ago, this court said on a regular basis, summary judgment is rarely granted in cases, in copyright cases of substantial similarity. Take, for example, another case involving the same defendant here, although in that case it was a plaintiff, and that was the Battlestar Galactica versus Star Wars case. I think I had my facts right. I think it was Fox. But in any event, the court, I mean, these are two motion pictures. And what the court does in its opinion, I commend that opinion as well, it lists 13 differences. And if you look at the 13 differences listed by the court, and you were to hand it over to my esteemed colleagues, they would slice and dice them and make everything on that list be generic. Things have changed. Not only do district courts routinely grant summary judgment, but they are starting to grant motions to dismiss. You don't even have a chance to bring in your expert and say, look, judge, this is not a, this is not something that you can compare. You are not an expert in literary criticism. When you take a film and you compare it to a piece of paper, you have to imagine, you have to imagine what the audience feels when it's acted out. You have to understand that these things are not accidental, that the choice is made here. Why a sea creature? Why not a gorilla? It would be easier to teach a gorilla to speak. Paul Zendel chose a mammal, a sea mammal, for particular reasons. At the very least, at the very least, Your Honor, a plaintiff, as a matter of due process, should be entitled to put on evidence. And also due process to the defendants. You know, there have been cast aspersions in public that this script was in fact plagiarized. Now, the movie got four Academy Awards. It was nominated for Best Original Script. And yet there's suspicion out there that in fact they stole the idea and the execution of the idea. They basically plagiarized Paul Zendel's play. I would think that defendants would want a chance to get in the court, deny it, and have a jury decide and forever remove the asterisk from the Oscar that they have earned. I see I'm way over my time. I'm happy to answer more questions. I hope the court will give me at least 30 seconds for a bottle. All right. Thank you, counsel. Thank you. Now, have you divided your time? Yes, we have, Your Honor. I'm going to take 10 minutes and my co-counsel will take five. All right. Thank you. Good morning, Your Honors. I'm Jonathan Zabin for the film defendants. Judge Lee, your hypothetical in this case was actually correct. The only thing that these works have in common is that it's a cleaning lady bonding with an animal who she attempts to have escape. What happened here, what the district court did, and I definitely want to discuss, Judge Wardlaw, your concerns with motion to dismiss. Well, I understand that the defendants in these cases, the people, you know, who you're representing, the institutions, the producers, the creators, they want to get rid of these things immediately. I practice enough in this area that I completely understand. But I do worry about the situation, and we don't have a published opinion. All the history of the Ninth Circuit, we do not have a published opinion affirming dismissal at Rule 12B6 stage on substantial similarity grounds. I don't think you can cite one. Well, I think there are two. They're not literary works. Okay, but they're not literary works. That is correct, Your Honor. One's photographs and one's something else. It was a map, Christensen in 1945. Something that's like, okay, you're not going to change this. No one can interpret that for you. I mean, it is what it is. But we're talking about literary works here where, you know, obviously we have script to movie in this case. In Esther White, we had treatment to television series that had gone on for years. I mean, I just don't – I think it's kind of hubris for a district court judge to think they have enough knowledge and basis in film and theory, you know, things that people go to school for, USC, UCLA, to learn all about that they can just decide this on just a dismissal stage, except I think in rare cases where it's just obviously so frivolous, and that might be this case. But, Your Honor, if I might, one, I don't think this is the close case. But, two, this circuit has been doing this successfully for many years. It's been done at the district court level, the substantial similarity. At summary judgment successfully for literary works? No, and also at the district court level for – at the motion to dismiss level, which has been supported by this court in at least four admittedly unpublished decisions. But four different panels of this court have examined motions to dismiss of literary works. But they're not binding on us. That is correct, Your Honor. What if we publish this one? No, I'm not claiming they are. If we publish this one, what would be the rule that you would recommend? I think the rule – if I might also suggest four other circuits have published decisions on this point. The second, the third, the seventh, and eighth circuits have all said that this examination should be made and can be made at the motion to dismiss level. But it's very rare. And I would say it should be limited to the most frivolous of cases because the standard at the Rule 12B6 stage is plausibility. Your Honor, I think that among other things that encourages the exact motion to dismiss are Twombly and Iqbal. I mean, the public policy here is for courts – Well, that's where plausibility comes from, right? That is plausibility. I'm quoting Twombly and Iqbal. I know. But, Your Honor, I would respectfully suggest that doesn't mean – plausibility does not mean the most possible frivolous case. No, it doesn't. It means exactly that. It must be plausible. But have they possibly stated a claim? And if you're looking at a script at a movie, I don't know – I mean, under what circumstances could you say that they had not plausibly treated a claim? In this case? Okay. Tell me why, then. Where Judge Lee's hypothetical was correct? Forget about Judge Lee for a second. Make your argument. Well, he made my argument. Well, no. I'm saying I want to know why this case is frivolous. Because the only thing – the only way that the plaintiff in this case has described similar elements, protectable elements, is as the district court found, basically by mischaracterization. There is no substantial similarity between a dolphin as a character and an Amazonian river cod. There is no substantial similarity of any protective element or any similarity at all, protectable or unprotectable, between the characters of Eliza and Helen. But you've got some similarities, right? I mean, so it's big bad government or big bad corporation, non-human creature. They're doing bad experiments on it. There's a lowly person who happens to be a janitor who arguably at some level bonds with the person in the play with these looks back and forth or whatever and definitely bonds with them obviously in the movie, comes up with an escape plan that involves a laundry hamper. So at that level, there's some similarity. My question has to do with what could be added by developing the evidence. I don't believe anything, Your Honor. What about what he said about – what Mr. Kaczynski said about expert testimony? The expert testimony is not going to change any of the things that Your Honor just enumerated, nor is it going to change any of the differences. This Court has on summary judgment admittedly, Judge Wardlaw, specifically said that the district courts are not required to have expert testimony in this type of work, nor are they bound by the expert testimony. These are different than music cases, Your Honor. Every one of Your Honors and every lawyer involved has had at least, I believe, 19 years of education starting in first grade, how to read, how to analyze, and how to look at works. That's what we do. We read cases. We dissect them. We understand comparisons. There is nothing a district court judge can't do at the motion to dismiss stage that he could do at the summary judgment stage. What about things like understanding significance of things in plots? I mean, I may have relatives who understand that, but I'm not sure I do. But Your Honor, I would submit that if it requires an expert to explain the similarity in a plot, it's not substantially similar as a matter of law. What about the fact that he didn't even, this district court judge, and this is the second time that I've been involved in a case, he didn't even have oral argument on this, so that the lawyers might be able to explain, you know. And the other thing I find troublesome is that the district court judges aren't holding oral argument, as in this case, but we're holding oral argument, so then we're hearing things that never got before the district court. Your Honor, I think there's a question as to the efficacy or usefulness of oral argument as... Do you think it's not useful? Do you want to sit down? Not for three minutes, Your Honor. You've got the time you need. As a Second Circuit practitioner, as you know, I'm from New York. Right. We almost never have oral argument in our district courts. The practice is just different. I'm not sure it's better or worse, but I don't think it materially changes the result. I don't think oral argument was necessary in this case. Judge Canelli, I think that district court judges are perfectly capable of doing this. We don't have to turn our district court judges into potted plants that sit there, look at the two works... Thank you. I appreciate that. ...that look at the two works and pretend the emperor has clothes. Yeah, but so I look at the two... I mean, I'm struggling. I mean, and I've done a lot of copyright work, you know, and I'm struggling with going through the plot and the characters and all of that, and different people in my chambers all have different views about all of this, and I think it would be useful for me to have someone who I can, you know, who had more knowledge of this process and, you know, choices, artistic expression in this area as things are developed. It might be useful for me to have the benefit of that. But a district court judge can always say that he or she would like expert testimony, say it's a close enough issue that expert testimony would be helpful. I think that's what they frequently do in music cases. I think that that is fairly left to the discretion of the district court as to whether he or she is capable of making that decision. I think any rule, Your Honor, that says we almost never grant motions to dismiss is going to doom this court and litigants to a year of further litigation, a million dollars in fees. I know that's a real concern. Then we'll be in summary judgment and doing the exact same analysis. Nothing will change. If you read the decisions in Binet or Funky Film. Then we might have more confidence in the result. I don't believe that either Binet or Funky Film or Berkik or any of the dozen of other cases, probably dozens of other cases in the literary area in the Ninth Circuit, and I could be proven wrong on this, has actually relied on the expert testimony in the substantial similarity analysis. And I'm talking in the literary. I know that they have in the music area. For the extrinsic part of the test. But in doing the extrinsic test, I think if you review the decision, expert testimony has never played a part as I read those decisions. So, I'm sorry, I'm at my time limit. Go ahead. No, it's okay. Has never played a part in those decisions. I'll go back and look at it. So, what the writer is suggesting is a formulation or a situation where we take judicial resources and litigants resources, go forward and then do the exact same thing a year or a year and a half later. Where it is evident that looking at these works and Judge Anderson had no problem doing it, the judges in Funky Films, in Binet, Berkik, this is easily doable. And this one isn't close. I mean, that's the thing. This is not that close case that Your Honor is worried about. This is a case where virtually every element is different except for that very large hypothetical of Judge Lee's, the janitor, the cleaning lady, a creature, a laboratory. And, by the way, the laboratories aren't even similar. Their laboratory is not a government laboratory. But why a laboratory? I'm sorry? But why a laboratory? Because that's where you experiment on animals or that's where it would be done. Occam, in the film, is not an animal experimentation laboratory. It's a super large military laboratory where they happen to bring this creature. The laboratory in the play is located on one floor of a building in Manhattan. And they say in the play there are a thousand other laboratories doing the same work. It has no military significance whatsoever. Every piece of expression is different except there's a cleaning lady and an animal, which we acknowledge. If there are no further questions, I don't want to encroach on my co-counsel's time. No. Thank you. Thank you. May it please the Court. One difference that is relevant to this Court in making its decision because what the Plaintiffs' Counsel has said is that you can't compare a play to a film. We respectfully disagree. And I adopt the argument presented by Mr. Zaven on behalf of the Fox defendants. But that's not even the situation when you talk about my client, MacMillan, which published a book. It is not a visual work. It is a written work that can be compared easily when you look at the elements. Counsel, do we have the book in front of us? It has been submitted, Your Honor. It was in the district court and we submitted it as well to the circuit. Okay. All right. Thank you. It's a more than 300-page book that goes into great detail, not only about the backstory of each of the characters that makes more relevant how the differences play out between and among them, but also about the plot that has a lot of other elements in it that are not in the either seven-page or 34-page play of the Plaintiffs'. The counsel for the Plaintiffs want you to ignore those differences, which respectfully is not what the law says. The court is to determine substantial similarity of protected expression, but you have to also consider the things that are different. The fact that they're both women that are the protagonists in both the play and the book does not mean that that's where the court stops, that that similarity somehow ends the equation. You look at all the differences between those two characters and evaluating that particular element under the extrinsic test. And the fact is that Eliza is not even completely human, which comes out in various parts in the book, but especially at the ending of the book when it's revealed that she is the same or similar to the creature in the lab. Well, I'm not sure that's all that obvious. I mean, I could go two ways. The concern I have here is that these things seem to be questions of degrees. I mean, okay, these things have some similarity, you say, at this very kind of conceptual level and a few details, and the Plaintiff says it's the opposite. And there's a lot of ground in between that. And I guess my concern, I'm just trying to grapple with dealing with this on a 12b6 motion as opposed to summary judgment when it's a question of degree. Your Honor, if we were talking about something that was nebulous or ambiguous, that might be a more difficult problem. But judges decide 12b6 motions all the time in a wide variety of cases that present complex issues, whether it's a defamation case or a copyright case or even an antitrust case. Here you have an objective set of criteria that the court uses to compare one work with another. That's an interesting thing, too, because I've thought about this case a lot. I mean, obviously, it's interesting. But I know we have the Ninth Circuit has a set of objective criteria. But when you think about applying them, I think what we're doing is everybody's subjectively applying them based on their own experiences, their own views, and it transforms this test into something that's highly subjective. I'm sure that the three of us sitting right here have different views about the degrees of similarity of this play. So it's not really—I know we try to make this particular test objective, but it can't help but be divorced from the subjective realm of experience of this particular one judge without oral argument applying these so-called objective factors. The factors themselves, Your Honor, and I understand the struggle if the test were simply is it at all similar. That would be a very different equation. But that's not the test. The test is whether it is substantially similar, looking only at protected expression. And when you carve out the things that are simply the idea of having a janitor who wants to save an animal from a research lab, that idea, Plaintiff's counsel acknowledges, is not protected by copyright law. So then you look at what the specific extrinsic— I mean, I think the story about someone, even, you know, a scientist who's working in there— I mean, I saw something like that on Veronica Mars recently. That story, you know, saving an animal that's being— that it is the lowliest person in the hierarchy. Free Willy, right? Free Willy. Free Willy, yeah. As in another one, right? Exactly. But the things that are different about that particular character, you can say, well, it's a janitor, so that is a similarity. But the particular characters of Helen and Eliza are very different. Eliza would not have been a character that could have existed in the film or in the book at a higher level because she cannot speak. She has certain things that limit her, particularly when this is all set in the 1960s, that would have limited that character. But the fact that she cannot speak is relevant to the creature that she actually is, which you discover little bits along the way, but discover most specifically at the end of the book and at the end of the film when she is finally reunited with the creature underwater. But that's not the first time that those differences are mentioned, either in the book or in the film. Can I ask you one question? Does the book—is the book in the same position as the film? I mean, does what happens with respect to the film rise or fall with the book? No, Your Honor, and with due respect to my co-counsel, certainly if the Fox defendants win, then McMillan would win as well because the plaintiff has not pointed to any similarities that they claim are in the book that are not in the film. But the book has many differences that make it a stronger case for finding no substantial similarity of protected expression. So if anything, the book has many more things that the court could point to that illustrate the differences, both in character, in plot, in sequence of events. Just to use the plaintiff's example of selection and arrangement, if you're looking at the sequence of events as they play out in one work versus the other, the book is very different from the play. It skips back and forth between periods of time. It skips back and forth between different settings. It starts with the whole backstory about the creature being hunted and then finally captured in the Amazon jungle, a very different starting place than the play, and it ends in a very different ending place than the play. But the description of the characters and the backstory that each of them have illustrate more fully why those are different characters and not similar, let alone substantially similar characters. Excuse me one second. Ms. Carrillo, would you stop blinking? Thank you. This drives me nuts when they do that. So while I agree with Mr. Zaven that all the defendants were correctly dismissed by the district judge and should be affirmed by this court, even if the court were to find one thing as to the film, it nonetheless has to evaluate the same substantial similarity comparison as to the book and the play, irrespective of what it finds about the film. And did the district court do that? The district court did, Your Honor. In fact, it mentioned not only that we would win for the same reasons, but said in a number of different places, this difference is even more pronounced in the book. So he isolated and identified specific differences that are in the book that make it an even stronger case for the defendants than in the film. But he did evaluate those works separately. Now, in talking about this being decided on a 12B6, again, I agree with what Mr. Zaven has presented. But the other thing that I would ask the court to consider, not only did the courts in the Supreme Court in Iqbal and Twombly identify the district courts as an appropriate gatekeeper and it admonished courts to not lose sight of the fact that sending a case into discovery, because that might be the easy default, has a very true cost, both in terms of the cost to the parties of going through the discovery process, the cost to the district courts of having all these cases in their courts when they shouldn't be there in the first place. It's not a frivolousness standard, but that standard is even more important when you're talking about things like copyright or defamation, where expressive works are involved. And the U.S. Supreme Court in Feist made this distinction very clear when it said you not only have to look at the rights of the authors being protected by copyright, but you also have to look at what they described as the copyright encouraging others to, quote, build freely upon the ideas and information conveyed by a work. This principle, known as the idea expression or fact expression dichotomy, applies to all works of authorship. Now, this court in the Satava case reinforced that and said the courts have to vigorously police that line between idea and expression  not just big studios because they're not the only ones who will be impacted by this court's decision. All manner of producers, all manner of writers and authors will be influenced and affected as well. And you have to carefully police that line so that those people's rights, as this court said, can make use of ideas that properly belong to us all. You have a general idea here. It's being described in the book and in the play in very different ways with different characters and different plots and different settings, different elements that go into each of those works. And I would encourage the court to look at the actual works because what the plaintiff has done in trying to turn what is a high school play about indicting research facilities on animals, turn that into somehow some kind of a love story between a woman and a dolphin just simply begs imagination. That is not anywhere in the play, and they're simply making that up in order to try to get this court to find a similarity that doesn't exist. We'd ask the court to evaluate the actual works, and based on that evaluation we think that you'll find the district court acted appropriately. Thank you, counsel. Thank you. Both counsel have gone over, so take a few minutes. First of all, this idea that the book, somehow the movie could infringe but the book not, it's just nonsense. I mean, you know, come on. It's the same story. They took the heart of my client's story. I mean, they took it and they put it in the movie. You can't avoid copyright infringement by adding something or beginning something at the end. I mean, it's just nonsense. Counsel can't believe that. Second point I want to make, I did want to answer Judge Canale's question about what experts can do Let me give you one other example. We have a legislative complaint that in making the movie, the sound engineer used dolphin sounds for the creature. And the designer, anyway, used the person who designs costumes and so on, the movements, used dolphin movements. So an expert could explain the significance of dolphins. This is not just a fish in the sea. Sure, Helen thinks it's a fish, but she's uneducated. No, this is a sea mammal. The significance is we have kinship, the play tells us, with the sea mammal, which is different from other animals. That is significant. Now, counsel worries about the costs of litigation, but, you know, there are rights involved here on both sides. Feist communications, copyright is a constitutional right as well. And there are copyrights, there are rights on both sides. And a plaintiff that asserts a right, there's been no challenge to the copyright, there's been even no denial that, in fact, there's been copying, should be entitled to bring in evidence. The case would look very different upon taking depositions and bringing in experts. What we found out was that Mr. Del Toro and Mr. Kraus sat there with a copy of the script, and they said, boy, this is a pretty good story. How can we adapt it for an adult audience? It's written for children. Obviously, they can't be R-rating in there. They can't have the sex and all that stuff. But there is an adult story here. So let's take as much as we can from this really great story, the story that has been celebrated, that schoolchildren all over the United States at one point were taught in school, you know, by the thousands. Let's turn it into an adult story and take as much as we can. The case would look very different than this sort of vague denial by counsel, oh, we don't admit copying, we deny this copying. But they're not witnesses. They weren't there. I mean, they're paired with evidence. One of the concerns I've got on the other side, I mean, not all these cases, I'm a district judge, obviously, not all these cases get up to appeal. We don't have as many as Chicago's. You've got on the left and the right coast, obviously. But I have over the years had a decent number of pro se copyright cases where somebody sues a movie or a book saying, well, I had this idea, you somehow got it and took it. And I guess I'm concerned about, and I don't want to denigrate pro se cases, obviously, but I'm concerned about something that says you can never dismiss one of these cases under 12b-6. I'm trying to figure out, as the other judges are, obviously, where the line is. You know, it used to be that this court said rarely grant summary judgment. It wasn't even thought of. The idea that you would dismiss without a chance to put on evidence, without a chance to examine the defendants about what it is they in fact took, without putting in experts, in a way it's a denial of due process. Just to show how much things have changed, let me quote from the case that 20th Century Fox won in 1983. Wow, that was a long time ago. And the list of similarities the court listed. And, you know, just imagine what they would do with this today. They'd say, the central conflict of the story is a war between the galaxy's democratic and totalitarian forces. Wow, that's novel, right? In Star Wars, the young hero's father had been the leader of the democratic forces, and the present leader of the democratic forces is a father figure to the young hero in Battlestar Galactica. The leader of the democratic forces is an older, wise man. You know, all of these things, none of this is new. This is not a frivolous case. This is a serious case. We have alleged the complaint that the reason Mr. Zendel, David Zendel, came to watch the movie and to think about the lawsuit is there was an avalanche of comments on the internet with people saying, hey, I saw this play, I learned this play, I saw this play in eighth grade, and now 40 years later I still remember it. It left such an impact on me. And to me it looks, and these are lay people, these are not people who have a stake in the outcome, this looks to me like the heart of the story was taken by the shape of water. I would think that they would want to clear that up with so much commentary about it, with Oscars having been given, having been nominated for an Oscar for a best original play, not adapted play, original script rather, I would think that they would want to have a chance to say, no, we didn't sit there with that script and steal the best parts of it. I would think that they would relish the thought of going before a jury, telling their stories, and hoping to be vindicated and basically clear their Oscars of disdain. Great counsel, you're well over time. I am grateful for the time you have given me. Thank you. One more item. I hope if this court does send it back, it at least consider sending it to a different district judge. I cast no aspersions on the fairness and impartiality of my classmate, Judge Anderson, UCLA grad, but he's made up his mind. Please, if you send it back, and unless of course you say there should be a trial in any event, please consider sending it back to a judge who has not made up his or her mind. Thank you. Thank you, counsel. Zedell v. Fox Searchlight Pictures is submitted. We'll take up EPSHA v. People of the State of California.
judges: Wardlaw, Kennelly, Lee